| | |
|---|---|
| James E. Cecchi<br>Lindsey H. Taylor<br>Donald A. Ecklund<br>**CARELLA, BYRNE, CECCHI,<br>OLSTEIN, BRODY & AGNELLO, P.C.**<br>5 Becker Farm Road<br>Roseland, New Jersey 07068<br>Telephone: (973) 994-1700 | Kara M. Wolke<br>Leanne H. Solish<br>Raymond D. Sulentic<br>**GLANCY PRONGAY & MURRAY LLP**<br>1925 Century Park East, Suite 2100<br>Los Angeles, California 90067<br>Telephone: (310) 201-9150 |
| *Liaison Counsel for Plaintiffs* | *Lead Counsel for Plaintiffs* |

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE EROS INTERNATIONAL PLC<br>SECURITIES LITIGATION | Case No. 19-cv-14125(JMV)(JAD) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS THE CONSOLIDATED COMPLAINT

630748.6

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     BACKGROUND AND STATEMENT OF RELEVANT FACTS ................................... 3

        A.      Background Of The Company And Its Business ..................................... 3

        B.      Eros's Large Capital Expenditures Left The Company With A Strained Liquidity Profile; Even As Defendants Repeatedly Tout Its Prudent Financial Policies And Conservative Balance Sheet ............................................................................. 3

        C.      Numerous Third Parties And Former Employees Report That Eros's Finances Were Not "Prudent" And "Conservative" And Recount Incidents Demonstrating Fundamental Liquidity Issues ................................................................................. 4

        D.      Eros's Stock Price Plummets As The Concealed Risks Central To Eros's Business Materialize Over The Course Of The Summer Of 2019 ........................................ 6

                1.      Eros's Largest Subsidiary Misses Debt Payments, Triggering A Series Of Credit Rating Actions And Further Reports Calling Into Question The Company's Liquidity .................................................................................. 6

                2.      Eros Take A Massive Impairment To Its Content Assets Balances ........... 8

                3.      Eros Turned To Toxic Financing To Source Its Cash Needs .................... 9

III.    APPLICABLE STANDARDS DISFAVOR DEFENDANTS' MOTION ......................... 9

IV.     ARGUMENT ............................................................................................. 11

        A.      The Defendants' Misrepresentations Are Actionable ........................... 11

                1.      Defendants' Affirmations of Eros's Financial Well-Being Were Materially False And Misleading .................................................................................. 12

                        a)      These Statements Cannot Be Dismissed As Mere Puffery ........... 13

                        b)      Defendants' Statements Were Not Forward Looking, And, As Such, Defendants Find No Refuge In the PSLRA Safe Harbor ............. 15

                2.      Defendants' Statements Concerning Eros's Intangible Content Assets Balances Were Materially False And Misleading ................................... 16

                3.      Defendants' Statements Concerning The Ratings Agencies' Actions Were Materially False And Misleading ................................................................. 20

a)    Eros's Assurance That It And Its Subsidiaries Met All Debt Service Commitments On The Heels Of The CARE Credit Downgrade Was Materially False And Misleading.................................................. 20

b)    The Assurances That Eros Was Working With CARE To Restore Its Credit Ratings Were Materially False And Misleading................ 21

c)    Defendants' Statements Concerning The Reasons For Moody's Withdrawal Of Its Credit Rating Were Materially Misleading .... 23

4.    Defendants' Attestations As To The Effectiveness Of Eros's Internal Controls And SOX Certifications Were Materially False And Misleading................................................................................ 25

B.    The Complaint Raises A Strong Inference Of Scienter ...................................... 26

1.    Defendants Knew or Recklessly Disregarded Critical Facts Undermining Their Public Statements ............................................................... 27

2.    Defendants' Statements Concerning The Ratings Agencies' Actions Support A Strong Inference of Scienter.................................................... 29

3.    The Circumstances Surrounding Eros's Massive Impairment Of Its Core Asset Contributes To A Strong Inference of Scienter .............................. 31

4.    Intangible Content Acquisition Was A Core Operation And Eros's Core Asset, Funding These Acquisitions Required Significant Liquid Funds .. 31

5.    Plaintiffs' May Rely On The Confidential Witness Statements ............... 32

6.    The Internal Control Attestations And SOX Certifications Support Scienter ...................................................................................... 35

7.    Defendants' "Competing Inference" Do Not Defeat Plaintiffs' Allegations Of Scienter ...................................................................................... 36

C.    The Complaint Adequately Alleges Loss Causation ........................................... 37

1.    The CARE Downgrade And Defendants' Responses Thereto ................. 38

2.    The Post-CARE Downgrade Disclosures ................................................. 40

D.    The Complaint Adequately Alleges Control Person Liability .............................. 43

E.    The Court Has Personal Jurisdiction Over Defendant Lulla ................................ 43

V.    CONCLUSION ....................................................................................................... 45

# TABLE OF AUTHORITIES

<u>CASES</u>

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 10

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 10

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) .................................................................................... 1

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011) .................................................................................. 10

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ............................................................................ 11, 34

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014) ............................................................................ 14, 25

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
   686 F. Supp. 2d 404 (D. Del. 2009) ............................................................ 25, 26, 35

*City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*,
   41 F. Supp. 3d 1369 (S.D. Fla. 2011) ............................................................... 44, 45

*Craftmatic Sec. Litig. v. Kraftsow*,
   890 F.2d 628 (3d Cir. 1989) .................................................................................. 26

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018) .............................................................. 43, 44

*De Vito v. Liquid Holdings Grp., Inc.*,
   2018 WL 6891832, n.37 (D.N.J. Dec. 31, 2018) ............................................. 37, 40

*Derensis v. Coopers & Lybrand Chartered Accountants*,
   930 F. Supp. 1003 (D.N.J. 1996) ..................................................................... 43, 44

*Dudley v. Haub*,
  2013 WL 1845519 (D.N.J. Apr. 30, 2013) ........................................................................ 29, 30

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................................ 37, 38

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3rd Cir.2000) ................................................................................................ 37

*Fergus v. Immunomedics, Inc.*,
  2020 WL 2832565 (D.N.J. June 1, 2020) ............................................................................ 11

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................................................ 17

*Ganino v. Citizens Util. Co.*,
  228 F.3d 154 (2d Cir. 2000) .................................................................................................. 24

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019) ........................................................................ 14

*Hill v. State St. Corp.*,
  2011 WL 3420439 (D. Mass. Aug. 3, 2011) ...................................................................... 35

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004) .................................................................................................. 12, 15

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) .................................................................................................. 14

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) .................................................................................................. 14

*In re Banc of Cal. Sec. Litig.*,
  2017 WL 3972456 (C.D. Cal. Sept. 6, 2017) .................................................................... 41

*In re Bradley Pharm., Inc.*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ...................................................................................... 39

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ................................................................................................ 21

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ...................................................................................... 27, 28, 32

*In re Celgene Corp. Sec. Litig.*,
    2019 WL 6909463 (D.N.J. Dec. 19, 2019) ................................................................ 16

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015) ................................................... 10, 24, 25

*In re Eros Int'l Sec. Litig.*,
    2017 WL 6405846 (S.D.N.Y. Sept. 22, 2017) .............................................................. 6

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) ......................................................................... 33

*In re EZCorp, Inc. Sec. Litig.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016) ....................................................................... 34

*In re Galena Biopharma, Inc. Sec. Litig.*,
    2019 WL 5957859, n.2 (D.N.J. Nov. 12, 2019) ................................................. 23, 37

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012) ....................................................................... 28

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    237 F. Supp. 3d 943 (N.D. Cal. 2017) ......................................................... 19, 20, 31

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ....................................................................... 15

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ...................................................................... 13

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ................................................................ 6

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ...................................................................................... 21

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ......................................................... 11, 12, 24, 39

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013) ....................................................................... 13

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002) ....................................................................... 31

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
380 F. Supp. 2d 509 (D.N.J. 2005) ...................................................... 44

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................................... 41

*In re U.S. Interactive, Inc.*,
2002 WL 1971252 (E.D. Pa. Aug. 23, 2002) ........................................ 14

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................ *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009)............................................... 37, 39

*In re Vivendi Universal, S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................... 14

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)........................................................... 16, 37

*In re Wilmington Tr. Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014)................................................... 14, 37

*In re Winstar Commc'ns*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)......................................... 41

*In re: Bofi Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)........................................ 6

*Institutional Investors Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)........................................................... *passim*

*Junker v. Med. Components, Inc.*,
2015 WL 12806501 (E.D. Pa. May 20, 2015)........................................ 45

*Langford v. City of Atl. City*,
235 F.3d 845 (3d Cir. 2000)............................................................... 10

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*,
2011 WL 2444675 (D. Del. June 14, 2011)........................................... 14

*Martin v. GNC Holdings Inc.*,
2017 WL 3974002 (W.D. Pa. Sept. 8, 2017)......................................... 41

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..................................................................... 10, 11, 12, 29

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)................................................... 18

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)................................................................. 37

*Norfolk Cty. Ret. Sys. v. Ustian*,
    2009 WL 2386156 (N.D. Ill. July 28, 2009)........................................ 42

*Omnicare v. Laborers Dist. Council Const. Industry Pension Fund*,
    575 U.S. 175 (2015).............................................................................. 17

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)................................................................. 15

*Oregon Laborers Employers Pension Tr. Fund v. Maxar Techs. Inc.*,
    2020 WL 5500458 (D. Colo. Sept. 11, 2020)................................ 17, 31

*Pennsylvania Transportation Auth. v. Orrstown Fin. Servs., Inc.*,
    2016 WL 466958 (M.D. Pa. Feb. 8, 2016) ......................................... 26

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)................................................................. 10

*Pinker v. Roche Holdings Ltd.*,
    292 F.3d 361 (3d Cir. 2002)................................................................. 44

*Pub. Employees' Ret. Sys. of Miss., P.R. Teachers' Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) .............................................................. 42

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .............................................................. 32

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)..................................... 31, 33

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) .................................................. 18

*SEC v. Am. Growth Funding II, LLC*,
    2018 WL 1626148 (S.D.N.Y. Mar 29, 2018) ..................................... 21

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)......................................................................................... *passim*

*Teamsters Local Union 863*,
    2013 WL 5676739 (D.N.J. Oct. 16, 2013)................................................................. 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................................ 10, 27

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
    2019 WL 2521834 (D. Colo. June 18, 2019)............................................................. 41

*Vanderhoef v. China Auto Logistics Inc.*,
    2020 WL 5105243 (D.N.J. Aug. 31, 2020) ............................................................... 38

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015) ...................................................... 41, 43

*Weiner v. Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997)....................................................................................... 15

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
    2020 WL 3169506 (D.N.J. June 12, 2020) .......................................................... 29, 44

STATUTES

15 U.S.C. §78t(a) ....................................................................................................... 43

15 U.S.C. §78u-4(b)................................................................................................... 10

RULES

Fed. R. Civ. P. 9(b) .................................................................................................... 10

Fed. R. Civ. P. 12(b)(2)............................................................................................... 43

Fed. R. Civ. P. 15(a)(2)............................................................................................... 45

Lead Plaintiffs Opus Chartered Issuances S.A., Compartment 127 and AI Undertaking IV ("Plaintiffs") respectfully submit this opposition to Defendants'[1] motion to dismiss (Dkt. No. 37, the "Motion")[2] the Consolidated Class Action Complaint (Dkt. No. 34, the "Complaint"). The Motion should be denied in its entirety.

## I.    PRELIMINARY STATEMENT

This securities fraud class action centers on Defendants' affirmative misrepresentations of Eros's financial state. During the Class Period (July 28, 2017 to September 25, 2019), Defendants repeatedly volunteered that Eros's liquidity profile was strong, that Eros had a strong and conservative balance sheet, and that the Company was well capitalized and well funded.

In truth, Eros's balance sheet was littered with exorbitant payments and content advances to Lulla family members that were masked on the balance sheet as content assets, which accounted for as much as 70% of Eros's reported assets. Separately, the Company struggled to timely pay salaries, bills, and loans, revealing that Eros's liquidity was the opposite of strong – it was severely strained.

These truths were laid bare over a series of disclosures throughout the final months of the

---

[1] Defendants are Eros International Plc ("Eros" or the "Company"), CEO, Managing Director, Chairman and controlling shareholder Kishore Lulla ("Lulla"), and CFO, President of North American operations and director Prem Parameswaran ("Parameswaran"). Attempts to locate named defendant Jyoti Deshpande have not been successful.

[2] Defendants' accompanying memorandum of law (Dkt. No. 37-1) is cited as "Mot. __," citations to the exhibits attached to the Declaration of Christos G. Papapetrou (Dkt. No. 37-2) are "Mot. Ex. __," citations to the Complaint are "¶__," and citations to the exhibits to the accompanying Declaration of Donald A. Ecklund are "Opp. Ex. __." The exhibits to the Ecklund declaration are "incorporated by reference or integral to the claims, items subject to judicial notice, [and] matters of public record" which may be considered by the Court on a motion to dismiss. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Terms not otherwise defined have the same meanings as in the Complaint, and unless otherwise noted, alterations, citations, and quotations are omitted and emphasis is added.

Class Period, and investors lost millions as a result. On June 5, 2019, Eros's largest subsidiary was downgraded by CARE Ratings, India's largest credit rating agency, ten notches to *default* for delays in debt servicing of both principal and interest, delays of more than 30 days on interest for cash and packing credit and a delay of more than 30 days in payment of bills. This dramatic downgrade was followed by yet another credit downgrade by Moody's due to Eros's "strained liquidity" and poor controls, and the withdrawal of Moody's and S&P Global Ratings credit ratings. In detailing why a "liquidity event seemed to border on the inevitable," a report by Hindenburg Research detailed Eros's bloated payments and content advances to Lulla family businesses. About one month later, Eros impaired $405.5 million of its content assets, largely due to "changes in market conditions." Finally, with Eros's asset balances stripped and the confidence of and access to the traditional credit markets gone, Eros was forced to turn to toxic financing to procure cash needed for general corporate purposes.

In response, Defendants told the market, and would have this Court believe, that this all occurred because of delays of less than 90 days for loan interest payments totaling under $2 million dollars—a simple "clerical error." But four former employees and two current employees reported that Eros had trouble timely paying salaries since as far back as 2016. These same two current employees and three industry sources also reported to Reuters that Eros was not making payments owed to makers of movies and shows, further supporting CARE's report that EIML was late in making bill payments. And other confidential witnesses report that Eros was not making timely debt payments since as early as 2017.

In asking the Court to discount these varied and corroborated accounts to nothing, Defendants ignore that CARE itself explained that the downgrade was because of multiple payment delays. Indeed, it is implausible that these dramatic actions from varied stakeholders

630748.6                                    2

would have occurred over just two missed interest payments.  This inference is made even stronger by CARE's recent update to its default rating to note that the Company was not cooperating in efforts to monitor the rating.  Opp. Ex. A.  Viewed holistically, the Complaint alleges a cogent and compelling theory of fraud.  The motion to dismiss should be denied.

## II.    BACKGROUND AND STATEMENT OF RELEVANT FACTS

### A.    Background Of The Company And Its Business

Eros is a global entertainment company that co-produces, acquires, and distributes Indian language films in multiple formats worldwide.  ¶¶2, 40.  Eros was formed in 2006 to serve as the ultimate parent for an international group of businesses, the largest of which is its majority-owned subsidiary, Eros International Media Limited, ("EIML"), the core "Bollywood" film production and distribution business.  ¶¶2, 41, 43.  The Company originated in 1977 with EIML, and has since that time been tightly run and controlled by the Lulla family, with Defendant Lulla serving at the helm since control was transferred to him in 2006.  ¶¶3, 46-51.

Eros's business requires substantial, upfront, capital spending.  ¶¶5, 52, 58.  In the preceding six years, Eros has spent over $1 billion on content, which was then capitalized on the Company's balance sheet as intangible content assets.  ¶¶5, 52, 53.  Eros's capitalized content expenditures constituted most of its assets on its balance sheet: ranging between roughly 60% and 70% of Eros's total assets during the Class Period.  ¶53.

### B.    Eros's Large Capital Expenditures Left The Company With A Strained Liquidity Profile; Even As Defendants Repeatedly Tout Its Prudent Financial Policies And Conservative Balance Sheet

This major upfront spending[3] was not similarly matched with cash inflows to the Company,

---

[3] Which also included Eros's continued investment in and expansion of Eros Now, its digital streaming platform.  ¶¶5, 44, 58.

630748.6                                        3

and thus Eros was routinely crunched for cash.  ¶¶5, 58.  Eros's liquidity and financial state in general were a key concern for the market, with analysts considering liquidity a key metric.  ¶61.

Historically, Eros often tapped the public markets, raising hundreds of millions of dollars in capital from lenders and investors since its IPO.  ¶¶59-60, 63-64.  And despite its inability to generate meaningful positive cash returns from its purported content acquisitions, Eros's management frequently and consistently reassured investors that it would do so in short order, that it was "well capitalized," and that Eros's liquidity and balance sheet were "strong" and "conservative."  ¶¶60-65, 110-16, 122-26, 138-41, 157-62.  Parameswaran cited Eros's "financial policies are prudent and we have a very conservative balance sheet" as "key strengths."  ¶168.

C.    **Numerous Third Parties And Former Employees Report That Eros's Finances Were Not "Prudent" And "Conservative" And Recount Incidents Demonstrating Fundamental Liquidity Issues**

On June 7, 2019, Hindenburg Research published a report ("Hindenburg Report") highlighting numerous related party transactions between Eros and businesses run by relatives and those close to the Lulla family.  ¶¶13, 73.  As part of the report, Hindenburg explained that Eros had made $153 million in net payments and advances to NextGen Films Private Limited ("NextGen"), a company run by Lulla's brother-in-law, from 2012 through 2018, and, since Eros's November 2013 IPO, had made $95 million in net payments and content advances to NextGen. According to public records, Hindenburg noted that NextGen had only produced five films for a total budget of $19.35 million since the IPO, largely with Eros, and posed the logical question: if production costs totaled only $19.3 million, where did the rest of the money go?  ¶¶4, 13, 57, 73.

Third-party confidential witnesses ("CWs") confirmed that it was evident and a well-known secret in the Bollywood industry that Eros improperly used related-parties to inflate its financials.  ¶¶102, 106.  Indeed, even in its Class Period financials in which Eros disclosed its related party transactions with NextGen, and another business run by another brother-in-law to

Lulla, these related party transactions exacerbated Eros's cash flow concerns, while also having the positive effect of increasing Eros's intangible content assets balances. ¶¶53, 55-57. For just these two businesses, Eros paid almost $48 million for film rights and co-production advances during the 2017-2019 fiscal years, and since Eros's IPO in November 2013 (¶45), Eros has paid these two Lulla-family businesses $96.7 million for film rights and as content advances. ¶¶55-56. All of these payments to Lulla's brothers-in-law increased Eros's content balances, and accounted for just under 10% of Eros's content balance for its 2018 fiscal year. ¶¶53, 56. Eros's net advancements to NextGen for co-production for the three fiscal years reported during the Class Period was *almost double* the entire reported budget for all of NextGen's produced films since just before Eros's IPO, suggesting, at minimum, that Eros's content balances were inflated through Eros's projects with NextGen. ¶57; *see also* ¶109 (CW8, a Bollywood executive, said that Eros had a history of overpaying for its films).

Additionally, many former employees stated that from at least 2016 onwards, Eros had trouble timely paying salaries (¶¶95-98), and current employees told Reuters that these problems continued during the spring of 2019 (¶77). This Reuters article also reported that those employees and three other industry sources told Reuters that Eros had not been making other "payments due to makers of some movies and shows." *Id.*

Furthermore, CARE Ratings, India's largest credit rating, pointed to EIML's defaults/delays in debt servicing on its loans from banks, that it was late in paying interest on other credit extended to it and was late in paying other bills in assigning its June 2019 default rating. ¶¶66, 67. Third party sources with differing ties to EIML (ratings analyst, former auditor, and credit manager at a major Indian bank that had loaned money to EIML) likewise recounted EIML's

consistent troubles in repaying loan obligations.  ¶¶100, 104, 106.[4]

### D.    Eros's Stock Price Plummets As The Concealed Risks Central To Eros's Business Materialize Over The Course Of The Summer Of 2019

The summer of 2019 was unpleasant for Eros investors.  And that's because Eros's stock price was repeatedly pummeled as a result of a series of announcements, credit ratings actions, the Company's own massive write-down of its core asset, and by Eros turning to toxic financing—the sum total of which revealed to investors how precarious Eros's true financial profile really was.

#### 1.    Eros's Largest Subsidiary Misses Debt Payments, Triggering A Series Of Credit Rating Actions And Further Reports Calling Into Question The Company's Liquidity

After market-close on June 5, 2019, Eros received its first blow, when CARE Ratings, India's largest credit ratings agency, downgraded EIML, Eros's largest and flagship subsidiary, ten notches to default, due to EIML's "ongoing delays/default in debt servicing" and that EIML was more than 30 days late paying bills and interest on certain credits.  ¶¶66, 67, 190.  Before the market opened the next day, Eros sought to suppress the fallout by falsely affirming that "Eros

---

[4] Defendants' claim that Plaintiffs' sources for these allegations constitute manifold similarities between this case and the "Prior Action." Mot. at 5-6 (comparing this action to *In re Eros Int'l Sec. Litig.*, Case No. 15-cv-8956 (S.D.N.Y.)).  Although it may be true that both cases assert causes of action under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and rely on confidential witness statements and a short-seller report,  the same could be said for countless other securities fraud actions. *See, e.g.*, *In re: Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *16 (S.D. Cal. Sept. 27, 2016) ("Confidential witnesses have become a staple of securities litigation"); *cf In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("courts in this district frequently accept allegations based on short-seller reports at this stage in a case").

Although the actions supposedly have "manifold" similarities, Defendants do not, and cannot, point to any recycled allegations.  That is because the Prior Action asserted §§10(b) and 20(a) violations for very different misrepresentations made between 2013-2015, relating to: (1) the number and nature of Eros Now "registered users"; (2) Eros's ability to grow and generate returns based on its Eros Now business; and (3) Eros's film library and its ability to support the growth of Eros Now.  *See* Mot. Ex. 2 ¶¶162-254.  Contrary to Defendants' claim that Plaintiffs' "similar" sources were previously deemed insufficient, the court there did not even reach that point, finding that the plaintiffs failed to plead actionable misrepresentations and declining to analyze additional arguments. *In re Eros Int'l Sec. Litig.*,2017 WL 6405846 at *5-9 (S.D.N.Y. Sept. 22, 2017).

International PLC and all of its subsidiaries have met and *continue to meet all debt service commitments*. The Company retains the full faith and confidence of our lenders." ¶¶68, 191. Just hours later, and less than one hour from the market close, Eros walked back its initial denial in a second press release, this time admitting that "EIML was late on two loan interest payments for April and May 2019. These interest payments total less than $2 million and are currently in process of remittance." ¶¶69, 191. On all of this news, Eros's share price fell $3.59 per share, over 49%, to close at $3.71 per share on June 6, 2019, on unusually heavy trading volume. ¶¶70, 192.

The very next day, on June 7, 2019, S&P Global Ratings withdrew its preliminary B+ credit rating on Eros, because Eros failed to issue proposed senior unsecured notes to refinance its debt facilities. ¶¶73, 193. Also on this day, Hindenburg Research published a detailed report explaining, among other things, why it believed EIML had been downgraded by CARE, concluding that "a liquidity event seemed to border on the inevitable." ¶¶73, 194. The Hindenburg Report came to this conclusion after highlighting Eros's lopsided payments to NextGen for content rights and production advancements when compared to the budgets of NextGen's produced film catalog. *Id.* On all of this news, Eros's share price fell another $0.41 per share, or over 11%, to close at $3.30 per share on June 7, 2019, on unusually heavy trading volume. ¶74.

In response to all this news, the analyst firm Maybank Kim Eng dropped its coverage of Eros on June 10, 2019, citing the surprising missed debt payments and that CARE's downgrade of EIML was negative for Eros "because it impedes the Company's ability to raise both debt and equity," which correspondingly made it no longer possible to fundamentally value Eros. ¶¶75, 196. Analysts at Citi noted that a cash crunch at EIML posed a risk to Eros's shares when it slashed its price target for Eros in half on June 10, 2019. ¶¶76, 197.

On June 11, 2019, Moody's downgraded Eros to B2 from B1 and lowered its outlook for

630748.6

7

the Company to negative from stable.  Moody's stated that this downgrade reflects Eros's "strained liquidity profile," that it considered Eros's "weak liquidity profile" in its rating change, and further commented that the delays in debt servicing reflect the Company's poor financial management and controls across the Group.  On this news, Eros's share price fell $0.38 per share, or over 12%, to close at $2.77 on June 11, 2019, on usually heavy trading volume.  ¶¶78-82, 198.

About two weeks later, on June 26, 2019, Moody's announced that it had decided to withdraw its rating of Eros "for its own business reasons."  ¶¶83, 200.  On this news, Eros's share price fell $0.49 per share, or 22.5%, and continued to fall on the next day another $0.33 per share, or 19.5%, to close at $1.36 per share on June 27, 2019.  ¶¶84, 201.

### 2. Eros Take A Massive Impairment To Its Content Assets Balances

The negative media attention discussed above focused a spotlight on Eros's balance sheet, where Eros recorded its massive content expenditures as intangible assets.  *See* ¶¶85-86.  On July 15, 2019, Eros announced its financial results for its 2019 fiscal year, ended March 31, 2019, and reported an impartment loss of $405.5 million to its intangible content asset balances—a more than 40% impairment—which was allocated between an impairment loss of $366.7 million to film and content rights and $38.8 million to content advances.  ¶¶85, 202.  The impairment to content advances closely approximates the net content advances of $36.9 million to NextGen reported during the Class Period (fiscal years 2017-2019).  ¶¶56-57, 85.  Parameswaran also discussed this massive impairment during an earnings conference call held later that day.  ¶¶89, 203.

The sudden impairment leveled Eros's greatest asset—its content, for which the Company had spent over $1 billion in growing over the past six years.  ¶¶5, 52-53, 89.  Thus, the July 15, 2019 impairment removed any future expectation of economic return for a substantial portion of Eros's earlier content purchases—the balance sheet had been cleansed.

Eros explained the reasons for this enormous impairment, stating in its July 15, 2019 press release that "the Group recorded an impairment loss, totaling $423,335 thousand … *mainly due to high discount rate* … and *changes in the market conditions*." ¶86.[5]  On Eros's earnings call later that same day, Parameswaran further stated that "the impairment charge was part of IAS 36 … due to the significant decline in the market value, we tested impairment for carrying the value of net assets of the group exceeding our market capitalization and expenditure towards the purchase of content and film rights exceeding the positive cash flow from operations."  ¶89; *see also* ¶203.  Although these conditions had both existed previously during the Class Period, Eros did not previously impair its content assets.  *See* Sec. IV.A.2, *infra*.

On this news, Eros's share price fell $0.21 per share, or 11.5%, to close at $1.61 per share on July 15, 2019, on unusually heavy trading volume.  ¶¶91, 204.

### 3.      Eros Turned To Toxic Financing To Source Its Cash Needs

With the revelations of Eros's liquidity and balance sheet issues, Eros turned to highly dilutive, or toxic, short-term sources of capital to continue to fund itself.  ¶¶92-93, 205.  Thus, on September 26, 2019, before the market opened, Eros announced that it had entered into definitive agreements with an institutional investor on a registered direct offering of $27.5 million aggregate principle amount of senior convertible notes due 2020.  ¶¶92, 205.  In response, the Company's share price fell another $0.85, or nearly 30%, to close at $1.99 on extremely heavy trading volume (¶¶93, 206)—a reaction driven by confirmation of Eros's underlying liquidity issues (¶94).

## III.    APPLICABLE STANDARDS DISFAVOR DEFENDANTS' MOTION

To state a claim for securities fraud under §10(b) of the Exchange Act a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

---

[5] Eros also took an impairment of $17.8 million to goodwill and trademark.  ¶86.

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  These claims are subject to the pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b), requiring allegations of fraud to be stated with particularity.  15 U.S.C. §78u-4(b).  The PSLRA does not require a plaintiff to plead *evidence* of claims, however; on a motion to dismiss, courts must accept all facts alleged as true.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

As such, a complaint should not be dismissed if it contains sufficient factual matter that, if accepted as true, states a claim for relief plausible on its face.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Thus, the Third Circuit has explained that, even under *Twombly*, stating a claim "does not impose a probability requirement at the pleading stage," but "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).[6]

In sum, the issue on Defendants' Motion is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atl. City*, 235 F.3d 845, 847 (3d Cir. 2000).  The Complaint satisfies these pleading requirements, and Defendants' Motion should be denied.

---

[6] *See also In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *6 (D.N.J. Dec. 15, 2015) (following *Twombly* and *Iqbal*, courts should "assume the[] veracity [of well-pleaded factual allegations] and then determine whether they plausibly give rise to an entitlement for relief.") (citing *Burch v. Milberg Factors, Inc*., 662 F.3d 212, 221 (3d Cir. 2011)).

630748.6

10

## IV.   ARGUMENT

### A.   The Defendants' Misrepresentations Are Actionable

Under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).  The alleged false and misleading statements must be evaluated in the context they would have been understood by a reasonable investor.  *Matrixx*, 563 U.S. at 44 (2011).  Literally accurate statements "can become through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead prospective buyers."  *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011).  Thus, although §10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information, disclosure is required when necessary to make statements made, in the light of the circumstances in which they were made, not misleading."  *Fergus v. Immunomedics, Inc.*, 2020 WL 2832565, at *3 (D.N.J. June 1, 2020).

A misstatement or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  "Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992).  Thus, "[o]nly if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law."  *Id.*  Materiality is

thus a question of fact not suitable for disposition on a motion to dismiss. *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275-76 (3d Cir. 2004).

### 1.    Defendants' Affirmations of Eros's Financial Well-Being Were Materially False And Misleading

Defendants' first set of false statements consists of volunteered assessments of the Company's financial well-being: stating that Eros was "well-capitalized,"[7] that its liquidity, cash flows, and balance sheet were "strong"[8] and "conservative,"[9] and that its capital structure was solid (¶¶157, 160, 161, 167, 184).

By affirmatively making these characterizations, Defendants had a duty to speak truthfully about Eros's financial profile. *Merck*, 2011 WL 3444199, at *9 (citing *Shapiro*, 964 F.2d at 282; *Matrixx*, 563 U.S. at 45). As the Complaint details, Eros's liquidity was, in fact, significantly strained, and its balance sheet was not as strong or as conservative as Defendants professed. Rather, throughout the Class Period: (1) Eros's liquidity was so strained that it and its largest subsidiary, EIML, consistently had trouble timely paying its obligations, including loan payments, bills, and salaries (¶¶67, 77, 95-98, 100, 104, 106); and (2) that Eros's intangible content balances (which constituted between 65%-70% of total reported assets on its balance sheet) were inflated through related party dealings with members of the Lulla family (¶¶54-57; Sec. IV.A.2, *infra*).

It is these critical contrary facts which make Defendants' assurances about Eros's financial state materially misleading,[10] and not, as Defendants' insist, the resulting fallout (*see* Mot. at 14-15)—*i.e.*, the massive credit rating agency downgrades, the impairment of over $400 million in

---

[7] ¶¶110-11, 115-16, 125, 128, 133.

[8] ¶¶114, 122, 124, 128, 130, 138, 145-46, 158, 179.

[9] ¶¶135-36, 143, 153, 158, 164, 166, 168, 171-73, 184.

[10] *See* ¶¶121, 127, 132, 134, 137, 142, 144, 152, 156, 163, 165, 170, 174, 180.

Eros's content asset balances, and the resultant toxic financing deal to fund general corporate purposes (*see* Sec. II.D, *supra*; Sec. IV.C, *infra*). But the dramatic nature of CARE's downgrade combined with Eros's supplementary explanation does add more support to the misleading nature of Defendants' assurances: it is highly unlikely that CARE would downgrade EIML to default for its failure to pay two loan interest payments for less than $2 million and that were only delayed for a short period of time. ¶¶66-69. Moreover, it is highly unlikely that Eros would refuse to cooperate with CARE's request for information to restore Eros's previous rating if Eros's only financial problems were its failure to make the admitted two payments. *See* ¶101; Opp. Ex. A; Sec. IV.A.3.b), *infra.*

Defendants cannot disclaim liability by pointing to Eros's financial statements and the auditor's opinion (Mot. at 14). Eros's failure to consistently pay its obligations ***would not and were not*** reflected in its financial statements. In addition, financial statements report a company's historical results, which is why management's volunteered assessment of Eros's then ***current*** financial health was important to investors. For the same reasons, an audit opinion adds nothing. *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007) ("an unqualified independent auditor's opinion does not absolve or shield a defendant from liability"); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (similar).

### a)    These Statements Cannot Be Dismissed As Mere Puffery

Defendants contend that their statements about the health of Eros's financial state were immaterial puffery. To the contrary, Third Circuit law holds that "[b]y addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder[.]" *Shapiro*, 964 F.2d at 282. Thus, the Third Circuit held that, despite being conclusory, evaluations of management practices and financial well-being, including

630748.6                                           13

"strong," "solid," and "conservative," were actionable.  964 F.2d at 282-83.

In accordance with this authority, courts have commonly found that Defendants' evaluations of Eros's financial well-being – *e.g.*, "conservative," "strong," "solid" – to be actionable and not immaterial puffery.  *See, e.g.*, *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 447 (D. Del. 2014) ("rigorous" and "consistent" not puffery and noting that these were not just defendants' self-characterizations, but were repeated in SEC filings); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, 2011 WL 2444675, at *2, *10 (D. Del. June 14, 2011) (statements describing company's busines as "very strong," "very healthy," and "robust" actionable based on context made); *In re U.S. Interactive, Inc.*, 2002 WL 1971252, at *18 (E.D. Pa. Aug. 23, 2002) (statements concerning "incredible," "robust," and "strong" demand not puffery when considered in context); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 166, 180, 182 (S.D.N.Y. 2003) (representations that company was financially solid, including that it had a "healthy balance sheet" and was in a "very strong position," when "aware of the financial precipice on which it stood when its debt rating was almost downgraded" not puffery).[11]

Materiality here is further demonstrated by the Defendants themselves, with Parameswaran stating that two of Eros's "key strengths" were that its "financial policies are prudent and we have

---

[11] Defendants' authority is inapt.  *See, e.g.*, *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010) (oblique references to company's pricing policy was immaterial where followed by statements that "at a minimum convey the complexity of Aetna's business, diversity of its customers, and variable nature of its portfolio of insurance contracts"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538-39 (3d Cir. 1999) ("positive portrayals do not contradict any of defendants' other statements but merely report ***previous*** successes and express confidence in Advanta's prospects for future growth"); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 172 (3d Cir. 2014) (holding "spectacular" in context was forward-looking); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *15 (D.N.J. Dec. 27, 2019) (value-oriented statements, such as "… [g]uided by our purpose-driven strategies and values that are rooted in our credo, we will always put the needs and well-being of the people we serve first" were inactionable aspirational goal statements).

a very conservative balance sheet[.]"    ¶168.   Defendants also consistently repeated these characterizations in press releases filed with the SEC, during earnings calls, in its investor presentations, and during analyst industry conferences.  *See Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) (company's repeated reporting on a financial metric "created the reasonable understanding among investors that the [metric] was a number to which [the company] attached considerable significance").

Investors and analysts likewise found Eros's liquidity to be of critical importance (*see, e.g.*, ¶61 (analysts commented that liquidity was a key takeaway)).  *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 281 (S.D.N.Y. 2011) (materiality supported when analysts deemed metric to be significant).  Lastly, the market's reaction when the truth about the precarious nature of Eros's liquidity and balance sheet were revealed establishes the materiality of these statements. *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock").  At most, Defendants' arguments raise a fact question not appropriate for determination on the pleadings.  *See Adams Golf*, 381 F.3d at 275-76.

   **b)**  **Defendants' Statements Were Not Forward Looking, And, As Such, Defendants Find No Refuge In the PSLRA Safe Harbor**

The PSLRA "safe harbor" protects statements about the future if the statements are actually forward-looking and identified as such, accompanied by meaningful cautionary disclosures, and not made with actual knowledge that the statements were false or misleading.  *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009).

Because the statements at issue here are not-forward looking, the safe harbor does not apply.  For example, Defendants claim that certain challenged statements concern Eros's plan for the future (Mot. at 27), but the statements Defendants identify contain current characterizations:

*e.g.*, "the company remains well-capitalized" (¶116) and "[w]e have a strong balance sheet" (¶122). It is these non-forward-looking elements of the statements that Plaintiffs allege are false and misleading. *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649-50 (E.D. Pa. 2015) ("characterizations of past events or current conditions, or prefacing otherwise non-forward-looking statements with words of futurity or belief does not bring the statements within the protection of the safe harbor"); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (statement that Vivendi had a "very strong balance sheet" amidst defendants' future projections was not forward-looking).[12] Likewise, Defendants' statements that Eros is "on track" or "poised"[13] "pertain[] to [Eros's] current position vis-à-vis its future objectives. As a result, the statement is more akin to a mixed present/future statement. With respect to such mixed statements, the component of the statement that refers to the present is not protected by the Safe Harbor." *In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at \*14 (D.N.J. Dec. 19, 2019).

### 2. Defendants' Statements Concerning Eros's Intangible Content Assets Balances Were Materially False And Misleading

Defendants' second set of false statements concern Eros's intangible content asset balances reported during the Class Period,[14] which were materially inflated as a result of Eros overpaying family-owned entities for film rights and advancements for co-production (¶¶4, 53-57, 73) that were then capitalized on Eros's balance sheet as intangible content assets (¶53; Mot. Ex. 7 at 39).

First, contrary to Defendants' assertions otherwise, the overstatement of Eros's content

---

[12] For this same reason, the omission of the supposed key forward looking language in ¶¶110, 111 does not render Defendants' present and historical characterizations that "the company *remains* well-capitalized" and "we are *already* well capitalized" nonactionable. Mot. at 27.

[13] ¶130 ("Our balance sheet remains strong…. And we are on track…"); ¶¶153, 158 ("our conservative balance sheet … has us poised for growth").

[14] ¶¶113, 117, 123, 126, 129, 131, 139, 141, 147-48, 154-55, 159, 162, 167, 169.

balances are statements of fact, not opinions (Mot. at 15-17).  *See Oregon Laborers Employers Pension Tr. Fund v. Maxar Techs. Inc.*, 2020 WL 5500458, at \*12-13 (D. Colo. Sept. 11, 2020) (analyzing falsity of alleged overstatement of intangible assets as statement of fact); *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017) ("allegations of misstated asset valuations attributable to 'improper accounting practices' raise issues of objective fact that are not protected as opinion statements").  Although there may be judgment involved in accounting for its film content, such judgment is irrelevant here: this case is not about complex accounting judgments, but about the inflation of a specific input—the excessive payments/advancements to companies owned by Lulla's brothers-in-law.  ¶¶54-57; *see also*, *e.g.*, Mot. Ex. 7 at 39 (value of film includes budget at the "***actual cost*** of production").

Second, assuming Eros's content balances are opinions, they are still actionable as they omitted material facts "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, at 184-85, 194 (2015).  Eros repeatedly failed to disclose to investors that embedded into the value of its content balances was its payments to members of the Lulla family at values well above the market rate.  ¶¶53-57.  The market's reaction in response to the Hindenburg Report and to the announcement of the $405.5 million content balance impairment displays that investors found this omission material.

Third, Plaintiffs' sources are reliable and support the allegations.  Plaintiffs base their allegations on an independent review of Eros's financials and Hindenburg Research's detailed analysis and extensive review of Eros's financials, publicly available data on actual movie budgets, and other sources which are not publicly available.  *See generally* Mot. Ex. 3.  Different CWs confirm the allegations in the Hindenburg Report.  One CW, a Bollywood executive, stated that

the Company was well-known in the industry for using NextGen to inflate its financials and had a track-record of overpaying for content. ¶¶107-09. Another witness, a ratings analyst at CARE, also mentioned it was evident over the past years that Eros used "close associates" to inflate its revenues. ¶¶99, 102. Defendants' argument that the Hindenburg Report is inherently unreliable because Hindenburg Research was a short-seller has been repeatedly rejected by other courts, and at this stage of the litigation, the factual allegations from the Hindenburg Report must be accepted as sufficiently reliable. *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (collecting cases).

Fourth, Defendants disclosures – *i.e.*, that related party "transactions *may* not have been entered into at arm's-length" and Eros "*may* have achieved more favorable terms had such transactions been entered into with unrelated parties" – are entirely vague and boilerplate, and did nothing to warn investors that transactions with other Lulla family entities inflated Eros's content balances. *Cf. SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018) ("Cautionary language must be substantive and specific. Merely including language at the beginning or end of a statement that it is a subjective expression of belief is not enough, especially where there are embedded facts in the statement. The statements must include facts that the issuer knows contradict the forward-looking statement."). Defendants came nowhere close to actually warning investors that, for example, the terms of its deals with NextGen were so favorable that Eros's Class Period advances to NextGen for co-produced projects were almost double the entire combined budget for *all* films NextGen has produced since Eros's IPO (¶57).

Finally, although Plaintiffs' allegations of falsity vis-à-vis the inflated content asset balances do not rest on the July 2019 impairment (*contra* Mot. at 18), the circumstances surrounding the $405.5 million impairment does add support to the misleading nature of Eros's

previously reported content balances.  Defendants' cited two events that triggered the need for the impairment: (1) the carrying value for Eros's net assets exceeded its market capitalization; and (2) the "expenditure towards the purchase of content and film rights exceed[ed] the positive cash flow from operations."  ¶¶89.  But Eros tested for impairment at least annually (*see, e.g.* Mot. Ex. 1 at F-13), and both events *had already occurred well before* Eros actually impaired its content asset balances: as of March 31, 2018, Eros's then market capitalization (approximately $876.4 million)[15] was well below both net assets ($1.07 billion) and content assets ($998.5 million) at the time (Mot. Ex. 7 at F-3); and Eros's content and film rights expenditures had exceeded Eros's cash flows from operations both in its 2017 and 2018 fiscal years (*Compare* Mot. Ex. 7 at F-6 (reporting $98.993 million and $83.243 million in net cash flows from operations in 2017 and 2018, respectively); *with* ¶52 (content expenditures of $173.5 million and $186.8 million in 2017 and 2018, respectively).  Justifying a market decline as triggering an asset impairment when those circumstances existed during earlier reporting periods can support falsity at this stage.  *In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 955 (N.D. Cal. 2017).

Additionally, Eros explained that the impairment was "due to high discount rate … and changes in the market conditions."  But the discount rate Eros used only accounted for $108 million of the impairment, with the rest allocated to "changes in market conditions."  Defendants did not provide any details on what these changes in market conditions were, other than stating one of the changes was a lower projected volume,[16] despite such changes accounting for approximately 75%

---

[15] Market capitalization is market price per share times number of shares outstanding.  Eros reported that 65.4 million shares were issued and outstanding as of March 31, 2018 (which includes the "B" shares held by the Founder's Group (¶47)), and that Eros's share price traded as high as $13.40/share in March 2018 (Mot. Ex. 7 at 100).

[16] Defendants make much ado about their own explanation that a lower projected volume of 1% would account for a $63 million impairment.  Mot. at 18.  Plaintiffs did not "assign" this 1% figure,

of the content asset impairment. ¶¶86-88. Thus, with the spotlight on Eros's finances, including on its content expenditures, as a result of the credit rating agency actions and the Hindenburg Report, it is reasonable to assume that Defendants were forced to actually review its content expenditures and related content balances, used the further market decline as cover, and provided a vague explanation for the impairment to avoid further scrutiny. ¶88.

### 3. Defendants' Statements Concerning The Ratings Agencies' Actions Were Materially False And Misleading

Defendants' third set of materially false statements consist of their obfuscation of the reasons for certain credit ratings agency actions. ¶¶175, 177, 181, 185.

#### a) Eros's Assurance That It And Its Subsidiaries Met All Debt Service Commitments On The Heels Of The CARE Credit Downgrade Was Materially False And Misleading

Just before the market's opening on June 6, 2019, and hours after CARE's dramatic downgrade of EIML, Eros issued a press release responding to the downgrade and assuring investors that "Eros … and all of its subsidiaries have met and continue to meet all debt service commitments. The Company retains the full faith and confidence of our lenders." ¶175; *see also* ¶¶8, 68. This statement was objectively and admittedly false: hours later, Eros reversed course, and admitted that EIML actually was late on certain loan interest payments (¶69).

Defendants do not challenge falsity, but contend that Eros's later "clarification" makes their false statement immaterial. Mot. at 28-29. To begin, the materiality of this statement is a quintessential factual issue inappropriate for resolution at this stage. Eros's sole authority suggests

---

but because it was the only "change in market conditions" offered, Plaintiffs alleged that if the projected volume was lowered by 1%, it would account for $63 million in impairment losses, and thus *only* $234.5 million, or 58%, of the content impairment would be unexplained. Mot. Ex. 1 at F-13. That said, it is reasonable to assume that the actual decrease in lower projected volume was less than 1%, otherwise Eros would have likely provided the specific for that input, as they did with the change in discount rate. *Id.*

that the materiality inquiry is best left for trial.  *SEC v. Am. Growth Funding II, LLC*, 2018 WL 1626148, at *3-4 (S.D.N.Y. Mar 29, 2018) (denying summary judgment where materiality of indisputably false statement was disputed).

Even so, both common sense and the trading history for Eros's stock on June 6, 2019 betrays Defendants' immateriality characterization.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) ("the concept of materiality translates into information that alters the price of the firm's stock").[17]  Eros's stock price plummeted after the CARE downgrade on June 5, 2019, well after market-close.  Just nine minutes before the market opened the next day, Eros issued its false assurance and its stock price rose immediately upon the market's opening.  Opp. Ex. B (Eros's stock price plummeted $3.70/share in after-hours trading before opening at $3.60/share on 6/6/19, and rose almost immediately to $5.46/share on heavy trading volume).  Trading was even halted mid-morning on June 6, 2019 due to volatility.  Opp. Ex. C.

<blockquote>
<b>b)  The Assurances That Eros Was Working With CARE To Restore Its Credit Ratings Were Materially False And Misleading</b>
</blockquote>

Following the CARE downgrade, Defendants assured investors that they were "making it a priority to work with CARE Ratings, the regulatory agency, to have our credit rating revised upwards in due course."  ¶177; ¶181.[18]  However, CW5, a CARE ratings analyst/manager, reports that Eros actually refused to provide additional details requested by CARE in order to revise

---

[17] *See also, e.g.*, *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 274 (3d Cir. 2005) ("'reasonable investors' are the market[ and] information important to the market will be reflected in the stock's price.  Thus, 'information important to reasonable investors is immediately incorporated into stock prices.'") (quoting *Burlington*, 114 F.3d at 1425).

[18] Defendants repeatedly told the market that CARE's downgrade rested on EIML's clerical error in missing two loan interest payments for less than $2 million dollars, and that those payments were quickly repaid.  ¶¶69, 71, 181; Opp. Ex. D at 5 (Parameswaran stated that "we've taken up with the credit agency, yes, [the CARE downgrade] should be reversed….").

EIML's credit rating.  ¶¶99, 101, 178, 182.  And, as recently as three weeks before this filing, CARE provided an update to its default rating, adding the notation "Issuer Not Cooperating," and explaining that CARE had requested information from EIML to monitor the rating, but "[t]he company has not provided requisite information[.]"  Opp. Ex. A.

Defendants first contend that CW5's allegations actually support the veracity of their statements.  Mot. at 22 (quoting ¶101 ("Eros entered into discussions with CARE *in an attempt to convince* the agency to revise its downgrade").  "Attempting to convince" a ratings agency is not the same as "working with" a ratings agency.  Rather, refusing to provide requested details to the sole agency with the ability to restore EIML's severe credit downgrade is the *opposite* of "working with" the agency, which, in common sense terms, implies some sort of cooperation, collaboration, and/or assistance.  Defendants' quibbling over semantics only magnifies the misleading nature of their statements.

Defendants also challenge the reliability of CW5's allegations, complaining that the Complaint fails to provide substantiating details for CW5's statements.  Mot. at 22.  Not so.  The Complaint provides CW5's position at CARE: a ratings analyst/manager, and includes further details provided by CW5 that point to their knowledge, such as how long EIML had been rated by CARE, the number of analysts that have managed the EIML account, and who at EIML interacted with CARE.  ¶99; Sec. IV.B.5, *infra* (reliability of the CWs).  Differing sources also corroborate CW5's allegations, including: (1) that any discussions EIML had with CARE would have to be consulted and acted on the Lulla family's direction (¶99; *see also* ¶¶46-51 (Defendants' own statements discuss the Lulla family's control); ¶¶96, 103-105 (different CWs discuss the Lulla family's tight control); (2) that CARE did not learn of EIML's loan defaults through the Company and only learned so after the fact (¶100; *see also* ¶67 (CARE interacted with EIML bankers before

downgrading EIML); and (3) CARE's recent issuance of the "not cooperating" default rating (Opp. Ex. A).

Moreover, CW5's allegation that CARE only learned about EIML's loan defaults after-the-fact and not *from* the Company supports the allegation that Eros was non-cooperative post-downgrade. ¶100.  Eros's non-cooperation is reaffirmed by CARE itself: on September 25, 2020, CARE reaffirmed its default rating, and noted that EIML was not cooperating, *i.e.*, that EIML was not providing information requested by CARE to properly rate the company.  Opp Ex. A.

> **c)  Defendants' Statements Concerning The Reasons For Moody's Withdrawal Of Its Credit Rating Were Materially Misleading**

Approximately one week after Moody's withdrew its credit rating of Eros for its "own business reasons" (¶83), Eros garbled Moody's proffered reason by stating that "the Company reiterates that the recent withdrawal of its Moody's rating was at the Company's request given that it does not have any outstanding public institutional bonds."  ¶181.  On an earnings call on July 15, 2019, Lulla  went one step further, and addressed the "fake new or false reports about Moody's in their withdrawal of their rating" and "clarif[ied]" for the record" that Eros asked Moody's to withdraw coverage.  ¶185.[19]

Even if Eros did reach out to Moody's to request a ratings withdrawal, according to Moody's, that is not why it withdrew its credit rating.  Rather, Moody's withdrew its coverage for its "own business reasons."  ¶83.  According to Moody's "Policy for Withdrawal of Credit Ratings," "[w]hen Moody's indicates that a Credit Rating was withdrawn for 'business reasons,'

---

[19] Plaintiffs note that their version of the July 15, 2019 earnings call transcript attributes this statement to Lulla (*see* Opp. Ex. D at 5), while Defendants' version attributes this statement to Parameswaran.  Plaintiffs' version of the transcript must be accepted as the operative transcript at this stage of the litigation.  *E.g.*, *In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *1, n.2 (D.N.J. Nov. 12, 2019) ("When reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint.").

this refers to [Moody's] business reasons, ***not the business reasons of the Rated Entity*** or obligor"

and that this reason was "unrelated to the [other] situations identified above."  Opp. Ex. E at E08

(reason #6) (emphasis added); *see also* ¶¶183, 186.  One of the other reasons identified above in

Moody's Policy for Withdrawal of Credit Ratings was:

> Maturity of Obligation or Termination of Program: the Credit Rating on an obligation will be withdrawn when the obligation is not outstanding or the program has been terminated.  This includes when a debt matures, when a debt is called, when a debt is repaid before the maturity date, ***when a Credit Rating on a debt or program is issued and published but the debt is ultimately not issued*** or the program is not closed ….

Opp. Ex. E at E08 (reason #5); ¶¶183, 186.[20]  By affirmatively claiming the reason for Moody's

withdrawal was the Company's request, Defendants materially misled the market as to the reason

Moody's withdrew its credit rating.  ¶185 (analyst commented "[t]hat's an important point, I think"

regarding Defendants' "clarification" of the reasons behind Moody's withdrawal).

Defendants curiously attempt to invoke the truth-on-the-market defense[21] (Mot. at 23),

despite at the time calling the reasons for Moody's credit withdrawal "fake news" (¶185).

Defendants cannot prevail on this theory when their Class Period statements contradicted and

---

[20] The Complaint does not misstate Moody's Policy for Withdrawal of Credit Ratings.  *Contra* Mot. at 23.  As a national ratings organization, Moody's files its policies annually on SEC Form NRSRO.  Moody's 2019 Form NRSRO included the policy quoted in Plaintiffs' Complaint.  Opp. Ex. E at E08 (reason #6, "often" not included).  Defendants cite a policy that went into effect ***after*** Moody's withdrew its Eros credit rating and ***after*** Defendants' false statements.  *See* Mot. Ex. 17 ("Effective Date: January 2, 2020").  Still, Defendants have not explained why the modifier "often" materially alters the analysis when the policy they quote also separately lists a reason for situations in which Eros had no public bonds outstanding.  Mot. Ex. 17 (reason #5).

[21] "The 'truth on the market' defense recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market.  To prevail on a 'truth on the market' defense at the motion to dismiss stage of the litigation defendants must establish that defense as a matter of law on the basis of the allegations of the Amended Complaint." *Enzymotec*, 2015 WL 8784065, at *16.  Courts routinely recognize that "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *Merck*, 2011 WL 3444199, at *35 (similar).

obscured the truth. *See Enzymotec*, 2015 WL 8784065, at \*15-16 (declining to rule on application of truth-on-the-market defense at motion to dismiss where plaintiffs alleged that defendants' statements obfuscated the impact of regulations). Nor are Defendants' statements opinions as they are provably false pursuant to objective facts: Moody's own statement for its credit withdrawal and its operative Policy for Withdrawal of Credit Ratings. Defendants' citation to *City of Edinburgh* is misplaced (Mot. at 23). 754 F.3d at 170-71. This is not the situation in which there was a difference of opinion *within* the defendant company as to the appropriate actions to take based on clinical trial results. *Id.*

> **4.    Defendants' Attestations As To The Effectiveness Of Eros's Internal Controls And SOX Certifications Were Materially False And Misleading**

Defendants' fourth set of misstatements consist of attestations as to the effectiveness of internal controls and SOX certifications. *See* ¶¶118-20, 149-51. Such statements are actionable if the facts give rise to a plausible inference that defendants made these statements with the requisite scienter. *Shapiro*, 964 F.2d at 283; *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 417-18 (D. Del. 2009) (SOX certifications actionable if defendants had requisite scienter).

Here, the Complaint pleads facts showing Defendants' awareness of weaknesses in internal controls with respect to Eros's liquidity and its related party transactions which exacerbated the Company's poor liquidity and inflated Eros's content asset balances. These facts include: (a) Eros's frequent delays in payroll, bills, and debt servicing throughout the Class Period, *see* ¶¶77-78, 95-98, 100, 104, 106; (b) Eros's continual business dealings with members of the Lulla family at non-market rates, *see* ¶¶54-57, 102, 108; and (c) the Lulla family's controlling influence over the business, *see* ¶¶46-51, 99, 103-105. These are not subsequent events but were continual throughout the Class Period, the risks of which materialized towards the end of the Class Period.

630748.6                                          25

*Contra* Mot. at 20-21.   Independently, both Moody's and Lulla explained that poor internal controls exacerbated these first two events.  ¶79 (Moody's explained that "the delays in scheduled debt servicing evidence [Eros's] poor financial management and controls across the group"); ¶90 (Lulla admitted that observing Eros's internal controls to ensure that the corporate structure and payment systems detailed in the Hindenburg Report don't "ever happen again").

Based on these facts, Defendants' SOX certifications attesting that the 20-Fs had no material misstatements and/or omissions and fairly presented the financial condition and operations of Eros (¶¶119-20, 150-51) are also actionable.  *See City of Roseville*, 686 F. Supp. 2d at 418-20 (SOX certifications misleading and actionable despite no allegations of inaccurate financial figures or "breakdown in [company's] internal controls").

Internal control statements and SOX certifications are also material.  *See, e.g.*, *Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 466958, at \*3 (M.D. Pa. Feb. 8, 2016) (internal control statements are type of information a reasonable investor would consider significant in making an investment decision) (citing, among others, *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 n.17 (3d Cir. 1989) ("disclosures mandated by law are presumably material")).  Eros's analysts and Defendants also found them material.  *See* ¶¶79, 90. Nor are Defendants' supposed risk warnings so meaningful to render their statements immaterial (Mot. at 28).  Instead, they are incredibly generic and boilerplate.

### B.    The Complaint Raises A Strong Inference Of Scienter

Scienter is sufficiently alleged in the Third Circuit when a complaint's allegations give rise to a strong inference of "either reckless or conscious behavior."  *See Avaya*, 564 F.3d at 267, 280. Recklessness encompasses "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so

obvious that the actor must have been aware of it."  *Id.* at 267, n.42.  Conscious behavior, meanwhile, exists when a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements."  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).

An inference of scienter is "strong" if it is "cogent and compelling" and "*at least as likely as* any plausible opposing [non-culpable] inference."  *Tellabs*, 551 U.S. at 324, 328 (emphasis in original). An inference of scienter need not be *more* likely than any non-culpable inference; in the face of equally compelling inferences, a tie goes to the plaintiff.  *Id.* at 324 ("[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'").  Moreover, scienter can be inferred from "circumstantial evidence."  *Avaya*, 564 F.3d at 276.  On Defendants' Motion, the key inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 310.  As set forth below, Plaintiffs' allegations, taken together and read holistically, are adequate to allege a strong inference of scienter.

### 1. Defendants Knew or Recklessly Disregarded Critical Facts Undermining Their Public Statements

It is indisputable that Defendants publicly portrayed themselves as being highly knowledgeable about Eros's financial state.  Because of Eros's high capital expenditures for content and expanding its Eros Now streaming platform, without significant cash inflow, Eros's liquidity and its financial state were continually a key concern for the market.  *E.g.*, ¶61. Recognizing the importance of Eros's financial well-being, Defendants' volunteered assessments of such permeated their Class Period statements and took prominence in Eros's press releases announcing financial results, during opening remarks on earnings calls, and in presentations to

analysts during conferences. *See generally* ¶¶110-84. When, as here, defendants regularly speak to investors and analysts about important topics, it can be inferred that the defendants were knowledgeable about those topics. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (finding it "highly improbable" that defendant did not inquire into basis for his statements).

The Complaint also details facts, known or readily available to Defendants that contradict their public representations. *See* Secs. IV.A.1-3, *supra*. Such allegations are enough to allege recklessness. *Campbell Soup*, 145 F. Supp. 2d at 599 (plaintiffs may "state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"). The inference of scienter is even stronger after the CARE downgrade, where Defendants doubled-down in their positive assurances in a June 9, 2019 press release. ¶177(Lulla stated "I am pleased to inform shareholders that we now have a strong financial and operating position"); ¶179 (Parameswaran claimed that "Eros has a strong liquidity profile and healthy balance sheet"). Tellingly, in their Motion, Defendants do not even attempt to argue that they did not know about Eros's bloated payments to Lulla's in-laws, and that it would affect Eros's content asset balances, or that the Company was routinely late in paying its loans, salaries, and other bills and obligations.

Indeed, as the Company's CFO during the Class Period, Parameswaran had a duty to investigate the veracity of the Company's financials and the health of it in signing Eros's 2018 annual statement on SEC Form 20-F (¶148) and multiple SEC Form 6-Ks (¶¶128, 131, 141, 155, 162, 169), in signing the SOX certifications accompanying the 2017 and 2018 20-Fs (¶¶119-20, 150-51), and in repeatedly touting the Company's "conservative" and "strong" balance sheet and liquidity and that Eros was "well capitalized" and "well funded."

630748.6

28

The inference of scienter is even stronger for Lulla, who was: (i) the Company's CEO, Managing Director, Chairman and founder; (ii) a controlling shareholder; (iii) the brother, father, husband, or in-law of the leaders of Eros's key subsidiaries, operations, and related parties; and (iv) professed "key person" for Eros.  ¶33, 46-50.  Parameswaran touted that Lulla's sole focus was Eros (¶50), Lulla himself represented to the market that he was knowledgeable about Eros's finances and the situation behind the Hindenburg Report (¶¶51, 90, 114, 145, 157, 160-61, 166, 177, 185-86), and multiple witnesses reported that Lulla "call[ed] all the shots" and was extremely hands-on (¶¶95, 96, 99, 103-04).  Furthermore, it was Lulla's own in-laws that repeatedly received payments for film rights and content advances well-above market rates.  *See Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *9, *10 (D.N.J. June 12, 2020) (circumstantial evidence of individual defendant who "controlled the [c]ompany as if it were a family business and was the only person who owned a significant portion of it" sufficient to plead scienter).

### 2. Defendants' Statements Concerning The Ratings Agencies' Actions Support A Strong Inference of Scienter

Affirmative steps taken by Defendants to discredit specific public criticisms point to finding scienter.  *See Matrixx*, 563 U.S. at 49 & n.15 (describing the misleading press release as the "[m]ost significant[ ]" fact in favor of a finding of scienter); *see also*, *Avaya*, 564 F.3d at 270 (strong inference of scienter alleged where CFO denied "widespread and unusual discounting" in response to analyst questions about pricing).  Here, in response to CARE's downgrade and Moody's withdrawal, Defendants immediately punched back, further confusing the truth about the extent of Eros's deteriorating liquidity and financial state.  *See Dudley v. Haub*, 2013 WL 1845519, at *18 (D.N.J. Apr. 30, 2013) (misleading statements about company's deteriorating relationship with its vendors and attempts to minimize its negative cash flow gave rise to strong inference that defendants "consciously omitted negative information so that analysts and investors would not

know the full extent of the [c]ompany's liquidity crisis").

When the CARE downgrade was announced, Defendants denied the published findings from CARE's due diligence process. Before the market could fully digest the downgrade, Eros released a press statement declaring that Eros and its subsidiaries have met and continue to meet their debt commitments. This statement was hardly a "mistake" (Mot. at 35), but was made with full knowledge that Eros and EIML were, at minimum, currently late in making debt payments amounting to almost $2 million, and that the Company routinely had trouble making loan payments and other obligations in recent years (Sec. IV.B.1, *supra*). Indeed, EIML had already disclosed the same thing to the Indian stock exchanges ***almost 8 hours before*** Eros made this blatantly false statement to U.S. investors. ¶69. It then took another 6 hours for Eros to clarify that it actually was late on two loan interest payments. *Id.*

Defendants continued to obscure the severity of CARE's downgrade by assuring investors that they were "making it a priority to work with CARE Ratings" and that EIML's previous rating would be quickly restored. ¶¶69, 71, 177, 181. CW5, a ratings analyst at CARE, reports the opposite: that Eros instead "attempt[ed] to convince the ratings agency to revise its downgrade, but that when CARE asked for additional details, Eros refused to provide them" (¶101)—a fact that was recently confirmed by CARE. Opp. Ex. A. There is seemingly no other purpose for these assurances other than to purposely mislead investors, and indeed, Defendants do not proffer any alternative inference.

Then, when Moody's withdrew its credit rating of Eros for its "own business reasons," Defendants again purposely obscured Moody's stated reason why, even calling it "fake news," in direct contradiction to Moody's stated reasons and published policy expounding on this reason. ¶¶181, 183, 185-86. Again, Defendants do not offer a plausible inference of non-culpable conduct,

let alone a *more* compelling inference than Plaintiffs' allegations of conscious misbehavior.

### 3.    The Circumstances Surrounding Eros's Massive Impairment Of Its Core Asset Contributes To A Strong Inference of Scienter

Defendants ask the Court to infer that the circumstances surrounding its $405.5 million impairment to its core asset support an inference of good faith. Mot. at 36-37. Although the most recent decline in market capitalization provided a good cover to why Defendants undertook an impairment analysis, as detailed above in Sec. IV.A.2, the supposed triggering events had previously occurred during the Class Period with no impairment. *See Leapfrog*, 237 F. Sup. 3d at 954-55 (timing of impairment supported scienter where circumstances triggering impairment previously existed in prior financial period). Rather, it is far more plausible that the events in the month before the impairment shown a spotlight on Eros's balance sheet, and the Company could no longer keep reporting inflated content asset balances. This inference is supported by the vague explanation for the impairment: that approximately 75% of the content asset impairment was due to "changes in market conditions." ¶¶86-89. Combined with the size of the content asset impairment[22] – $405.5 million, approximately 40% of Eros's previously reported balance – an inference of scienter is at least as compelling as one of good faith. *Maxar Tech.*, 2020 WL 5500458, at *15-16 (scienter sufficiently alleged where impairment analysis only taken after short seller questioned company's financial health and accounting practices, where defendants' explanations for the impairment had happened prior, and noting that the size of the impairment, $383.6 million, supported an inference of scienter).

### 4.    Intangible Content Acquisition Was A Core Operation And Eros's

---

[22] Defendants are wrong that the size of the impairment cannot support scienter. Rather, "the magnitude of the fraud, while not determinative of scienter, is probative of it." *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 506 (W.D. Pa. 2002); *see also Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *21 (D.N.J. July 27, 2018) (size of the scheme supports inference of scienter). Defendants' cited cases hold no different. Mot. at 36.

**Core Asset, Funding These Acquisitions Required Significant Liquid Funds**

"[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Urban Outfitters*, 103 F. Supp. 3d at 654.[23]

Eros's core operation is to acquire content and monetize it. ¶¶2, 4, 5, 19-20, 40-45, 52-59. From 2014 through 2019, Eros spent over $1 billion on content (¶52), and during the Class Period, its content accounted for 65% to 71% of Eros's total assets (¶53).  Likewise, Eros needed significant liquid funds to support these acquisitions, and had traditionally turned to the capital markets to source this need.  ¶¶58-59.  Thus, Eros's ability to timely pay its obligations was crucial to ensure its creditors that Eros deserved their loans.  To infer that Parameswaran and Lulla were without knowledge of the Company's core assets, business operations, and impediments to Eros's ability to access traditional capital markets where Lulla and his family tightly controlled Eros is "absurd."  *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014).

**5.     Plaintiffs' May Rely On The Confidential Witness Statements**

The Complaint's allegations relating to the eight CWs supports a strong inference of scienter.  These former employees and additional third-parties describe Eros's troubles throughout the Class Period in timely making salary and loan payments, its use of related-party transactions to inflate its financials, and corroborate Lulla's controlling influence over seemingly every aspect of Eros.  ¶¶95-109.  Relying on CWs to satisfy the PSLRA's pleading requirements is routine and

---

[23] *See also Avaya*, 546 F.3d at 268 (recognizing a "core operations inference" supports scienter when securities fraud alleged related to core matters of central importance to a company); *Campbell Soup*, 145 F. Supp. 2d at 599 ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business.") (collecting cases).

widely accepted.  To determine the reliability of the CWs, "[t]he The Third Circuit explained that the proper test entails evaluating 'the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of the other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Urban Outfitters*, 103 F. Supp. 3d at 648-49 (quoting *Avaya*, 564 F.3d at 263).

Here, each of the former employees, with differing titles and in varied departments, each stated that salary payments were delayed at EIML from as early as 2016 through the end of the Class Period.  ¶¶95-98.  The Complaint provides the position and dates of employment for the former employees, and indeed, this is all that is needed to establish the basis of their knowledge for the detail provided. *Roofer's Pension Fund*, 2018 WL 3601229, at *23 (former employees that "spoke to issues within their sphere of knowledge" credited and supported a strong inference of at least reckless behavior); *see also In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 97 (S.D.N.Y. 2006) ("[A]t the pleading stage the issue is not whether these [CWs] are telling the truth.  It is whether there is a probability that they know what they are talking about").  CW4 even offered that the salary delays was why they quit.  ¶98.  These are not "irrelevant opinions" but support Plaintiffs' allegations of the precarious nature of Eros's liquidity and financial position during the Class Period.

As to the non-employee CWs, the Complaint provides their relevant positions, and certain details which would provide the basis of the respective CW's knowledge: CW5 is a ratings analyst/manager at CARE and provided specific details about CARE's relationship with EIML, including details that are corroborated by CARE's downgrade and subsequent update noting that EIML was not cooperating (¶99; Opp. Ex. A); CW6 is an accountant with EIML's auditors, and assisted in the audit of EIML's 2017-2018 statutory audit (¶103); CW7 worked as the credit

manager with the Bank of Baroda during the bank's loan sanction to EIML in 2016 (¶106); and CW8 is a Bollywood industry executive, and thus familiar with Eros through their decades of experience in the industry (¶107).

Notably, each account is corroborative of each other and other sources. *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 209-10 (S.D.N.Y. 2016) ("Also supporting a finding of scienter is the collective picture painted by the [CWs]"). Each of the former employees stated that EIML had trouble timely paying salaries, which is also corroborated in a Reuter's article (¶77). The additional CWs likewise detail EIML's trouble in timely paying its loan obligations as early as 2017 (¶¶100, 104, 106), which is corroborated by the CARE downgrade itself. Reuters and CARE both reported that EIML was having trouble in paying other obligations (¶¶67, 77), which corroborate the CW accounts of EIML's trouble in timely paying salaries and loan payments. Such varied sources that "corroborate and reinforce one another" thus "help provide particularity." *Chubb*, 394 F.3d at 155. While each of these accounts may not on their own establish scienter or falsity, together with the CARE downgrade, Hindenburg Report, Reuters article, subsequent ratings actions and the massive content impairment, support the inference that this was not simply a "clerical error" indicative of mismanagement, but indicative of Eros's undisclosed dire financial position, and Defendants' knowledge or reckless disregard thereof.

Likewise, CW5 and CW8's accounts that Eros used related-party transactions, particularly deals with NextGen (¶¶102, 108), is corroborated by the Hindenburg Report, as is CW8's observation that Eros is known in the industry for overpaying for content (¶109). Finally, the observations from the CWs (CWs 1, 2, 5, 6) that Lulla was very hands on and made the ultimate decisions supports the inference of his scienter (*see* Sec. IV.B.1, *supra*), and is corroborated by statements from Eros, Parameswaran, and Lulla himself touting Lulla's hands-on management and

tight control over Eros.[24]

### 6.    The Internal Control Attestations And SOX Certifications Support Scienter

Defendants argue that SOX certifications and internal control attestations are boilerplate and add nothing to the calculus.  Mot. at 38-39.  However,  SOX certifications are meant to ensure corporate executives thoroughly review the information reported in SEC filings to present a fair picture of the company.  *Roseville*, 686 F. Supp. 2d at 419-20 ("the SEC interprets 'fair presentation' of financials to include any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition").  Thus, SOX certifications of financial statements that contain false or misleading information are indicia of scienter. *Urban Outfitters*, 103 F. Supp. 3d at 653 (SOX certifications "can be probative of scienter when in conjunction with other evidence of recklessness").  In signing SOX certifications, Lulla and Parameswaran knew of and recklessly disregarded Eros's continual difficulties in timely paying its obligations, and that Eros was maintaining an inflated intangible content asset balance by significantly overpaying Lulla-family entities for content.  In addition, Lulla's and his family's controlling influence evidence lax internal controls, specifically where multiple sources report that no decision was made without Lulla's approval.  *See* ¶¶46-51, 90, 95-96, 99, 103-04.  Moody's also opined that Eros's failure to timely pay its debt evidence poor controls.  ¶79.  Lax internal controls may reinforce an inference of scienter.  *E.g.*, *Hill v. State St. Corp.*, 2011 WL 3420439, at *13 (D. Mass. Aug. 3, 2011).  Thus, these certifications when viewed with Plaintiffs' additional

---

[24] Defendants repeat their attacks on the Hindenburg Report in their arguments challenging falsity and scienter.  *Compare* Mot. at 17, 19; *with id.* at 37-38.  For the reasons stated above, the allegations from the Hindenburg Report must be credited at this stage.  Separately, Plaintiffs do not cite the Seeking Alpha article to support an inference of scienter, it is instead used to show how the market viewed and reacted to the September 26, 2019 direct offering. ¶94.

allegations, are more indicia of scienter.

### 7. Defendants' "Competing Inference" Do Not Defeat Plaintiffs' Allegations Of Scienter

As set forth above, when read holistically, Plaintiffs' allegations support a strong inference of scienter. Defendants insist that Plaintiffs' well-pled allegations at most amount to a claim of mismanagement, noting that "not getting the best possible deal in a transaction" and missed loan payments are prototypical corporate mismanagement. Mot. at 33-35. But Defendants' did not "get the best possible deal" in repeated transactions with Lulla's own in-laws, so much so that Eros's content advances to NextGen during the Class Period were almost double the actual combined budget for NextGen's entire film repertoire since Eros's IPO (¶57). And it is extremely unlikely that a couple of missed loan payments led to a ten-notch credit downgrade to default,[25] another credit downgrade days later, two credit rating withdrawals, and a financing deal with such unfavorable terms that it was considered a "toxic financing transaction" and Eros's share price fell another 30% in response (¶¶92-94). Rather, the more compelling inference is that Eros's liquidity and financial state were so dire that the default rating, subsequent ratings actions and toxic financing deal were warranted. This inference is confirmed by CARE's recent update to its credit rating, which maintained the default rating and noted that EIML was not cooperating, and failed to provide information CARE requested to arrive at a fair rating. Opp. Ex. A; ¶101. Indeed, the more compelling inference is that Defendants knew of and concealed Eros's dire financial state from their investors.

---

[25] In reporting on CARE's downgrade, Macquarie Research took Defendants at their word, that the downgrade was due to two late loan payments of less than $2 million dollars, and entitled the report "Hard to explain." ¶71.

C.      **The Complaint Adequately Alleges Loss Causation**

"Loss causation is a causal connection between the material misrepresentation or omission and the loss suffered." *Urban Outfitters*, 103 F. Supp. 3d at 655.  Loss causation is not subject to any heightened pleading requirements.  Instead, under Rule 8(a), all that is required is that plaintiff provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 181 n.24 (3d Cir. 2001) ("to establish loss causation, a claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss.").[26]  "Third Circuit precedent instructs that loss causation is a fact intensive inquiry which is best resolved by the trier of fact." *Wilmington*, 29 F. Supp. 3d at 450 (citing *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3rd Cir.2000)).

This causal connection can be pled by alleging (i) a corrective disclosure or (ii) "the materialization of a concealed risk" that causes a stock price decline. *Wilmington*, 29 F. Supp. 3d at 450.[27]  Under either approach, "the exposure of the alleged fraud need not occur in a single, all-encompassing corrective disclosure; instead, the truth can be revealed through a series of partial corrective disclosures." *Urban Outfitters*, 103 F. Supp. 3d at 655-56; *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("For an event to qualify as a materialization of the risk, it need only disclose part of the truth that was previously concealed by the fraud.").

---

[26] *See also Galena Biopharma*, 2019 WL 5957859, at *18 ("A plaintiff need not satisfy the PSLRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2)").

[27] *See also De Vito v. Liquid Holdings Grp., Inc*., 2018 WL 6891832, at *39, n.37 (D.N.J. Dec. 31, 2018) ("The ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same: whether a 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'") (quoting *Vivendi*, 838 F.3d at 261-62).

Here, the Complaint pleads a series of partial corrective disclosures and/or partial materializations of concealed risks spanning from June 5, 2019 to September 26, 2019 through which the truth about Eros's significant liquidity problems and the precarious nature of Eros's bloated balance sheet were revealed to the market. Each of these partial disclosures/ materializations of the concealed risk were accompanied by a precipitous fall in Eros's stock price. ¶¶187-206; Sec. II.D, *supra*. These allegations provide Defendants with ample notice of "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342.

### 1. The CARE Downgrade And Defendants' Responses Thereto

On June 5, 2019, well after the market closed, CARE downgraded EIML ten notches to default, revealing the first cracks in Defendants' claims of Eros's strong liquidity and healthy balance sheet by reporting that EIML was experiencing "delays/default in debt servicing" and delays of more than 30 days in making interest and bill payments. Eros immediately refuted CARE's report, and then later admitted that EIML was, in fact, "late on two loan interest payments for April and May 2019. These interest payments total less than $2 million and are currently in the process of remittance." On this news, Eros's stock price fell $3.71, or over 49%, on June 6, 2019, on unusually heavy volume. ¶¶66-70; 190-192.

Apparently arguing that the corrective disclosures must mirror the false statements made during the Class Period, Defendants claim that the CARE downgrade of EIML and its responses did not actually reveal the falsity of their prior misleading statements. Mot. at 40, 41; *see also id.* at 42, 43 (arguing same for later disclosures/materializations of concealed risks). But the standard for pleading loss causation in the Third Circuit is not so exacting: "[a] corrective disclosure only needs to relate to the same subject as the misrepresentation and there is no requirement that the disclosure mirror the earlier misrepresentation." *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020); *Urban Outfitters*, 103 F. Supp. 3d at 655 (same).

630748.6                                    38

Under this standard, CARE's downgrade and Eros's later admission of the supposed details of EIML's delays in debt servicing constitute a corrective disclosure/materialization of the concealed risk. *See Vivendi*, 634 F. Supp. 2d at 363-64 (finding that a credit ratings downgrade could be a loss causation event, explaining that "[a] ratings downgrade reveals the risk of deteriorating liquidity"). Indeed, analysts at Maybank Kim Eng and Citi both cited liquidity concerns in response to this news. ¶¶196-97. Moreover, even if the CARE downgrade of EIML and Eros's response cannot on their own be considered a disclosure/materialization of the concealed risk, in conjunction with the subsequent events, the market learned of the severity of Eros's deteriorating liquidity. *In re Bradley Pharm., Inc.*, 421 F. Supp. 2d 822, at 828-29 (D.N.J. 2006) (dismissing argument that alleged disclosure did not correct prior misstatements, finding the first announcement "partially disclosed what the alleged misrepresentations had concealed from the market and began to reveal to the market place what the [later announcement] … confirmed").

Defendants likewise characterize the CARE downgrade as a "changed economic circumstance" from which the rest of the later revelations stem. Mot. at 40. But this ignores that CARE's downgrade to default was because of previously undisclosed risks of strained liquidity within the Group, to the point that EIML couldn't pay its debt and other obligations. ¶¶66-70. The news about EIML, and thus Eros, is what the market reacted to.

Finally, Defendants' assertion that Eros's first-released statement "cannot be separated from the downgrade … or Eros's later supplement" cannot support dismissal. Mot. at 41. Not only is this argument illogical, as there was seemingly no other purpose to Eros's first statement other than to refute the CARE downgrade and stop the sudden drop in Eros's share price, but, at the motion to dismiss stage, Plaintiffs do not need to disaggregate any potential confounding information. *Merck*, 2011 WL 3444199, at *31 (Plaintiffs "need not rule out the possibility that

other market forces … caused the almost 7% drop in Merck stock price.  Neither *Dura* nor any other legal authority cited by Merck impose such a pleading requirement on a securities fraud plaintiff."); *De Vito*, 2018 WL 6891832, at *41 (similar).

### 2.    The Post-CARE Downgrade Disclosures

Contrary to Defendants' assertion, the precipitous falls in Eros's stock price following CARE's downgrade of EIML were not due to the CARE downgrade, but, as the Complaint alleges, were further partial corrective disclosures and/or materializations of concealed risks revealing the truth about and extent of Eros's liquidity problems and the precarious nature of Eros's bloated balance sheet, with each event revealing a bit more to the market.  ¶¶193-206.

On June 7, 2019, the Hindenburg Report opined that CARE's downgrade was indicative of a "liquidity event" for Eros, citing the generous payments to Lulla family entities in relation to the actual budgets for those projects, which likewise padded Eros's largest asset on its balance sheet.  ¶194.  Also on this day, S&P Global Ratings withdrew its preliminary credit rating for Eros due to the Company failing to issue senior unsecured notes to refinance existing debt facilities. ¶193.  On this news, Eros's share price fell $0.41, or 11%, on unusually heavy volume.  ¶195.

On June 11, 2019, Moody's downgraded its credit rating of Eros and changed its outlook for the Company to negative, reflecting Eros's "strained liquidity profile."  ¶198.  Moody's explained that its concerns were exacerbated by EIML's delays in debt payments (¶78), and also that Eros's high working capital needs means that its liquidity was reliant on refinancing $72 million in short-term facilities (¶80).  On this news, Eros's shares fell $0.38 per share, over 12% on unusually heavy volume.  ¶199.  Then, on June 26, 2019, Moody's withdrew Eros's credit rating, which was followed by an almost 38% fall in Eros's stock price over two days.  ¶¶200-01.

Defendants argue that these events are inadequate to plead loss causation because "analysts' characterizations of previously disclosed facts do not constitute a corrective

disclosure[.]" Mot. at 42. Yet courts in this Circuit have held that the market may learn the truth about a defendant's misrepresentation from analysts' questioning of financial results. *Urban Outfitters*, 103 F. Supp. 3d at 656 (collecting cases); *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) (holding same).[28] The Hindenburg Report is no different than any other analyst questioning financial results or analyzing already public information. *See, e.g.*, *In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006) (loss causation may be pled where "findings in [short-seller] reports are not attributed to any non-public information"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) ("loss causation may be [based] upon ... third-party analyses of a company's financials, which contradict representations made by defendants").[29]

Here, the Hindenburg Report provided detailed analysis concerning related party transactions "contributing" to the Company's deteriorating liquidity, backed up by extensive research from numerous sources, many of which are not publicly available. *See generally* Mot. Ex. 3 (conclusions based on review of private Indian and Singaporean company filings and on-the-ground investigation, among others). Plaintiffs allege that the Hindenburg Report's detailing of payments and advances to NextGen for content dwarfed the combined budgets for NextGen's productions not only recast Eros's liquidity troubles, but first revealed to the market that Eros's intangible content balances were bloated (¶194), which was later confirmed when Eros impaired $405.5 million of its intangible content assets a month later (¶202). Thus, even if the Hindenburg

---

[28] *Martin v. GNC Holdings Inc.*, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), holds no different. Rather, it held that analysts' speculation that defendant company's announcement of lower earnings expectations were tied, at least in part, to allegations in a previously-filed, state attorney general's complaint did not reveal any truth about the purported fraud. *Id.* at *19.

[29] *See also, e.g.*, *Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, 2019 WL 2521834, at *7 (D. Colo. June 18, 2019); *In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *10 (C.D. Cal. Sept. 6, 2017) (collecting cases).

Report by itself cannot be considered a disclosure, it can plead loss causation in conjunction with this later impairment. *See Pub. Employees' Ret. Sys. of Miss., P.R. Teachers' Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, at 318, 322, 324 (5th Cir. 2014) (publication of report by short-seller that "raised questions" about company's accounting and billing practices was not "by itself" a corrective disclosure because it merely speculated about wrongdoing, but together with subsequent disclosures, it "constitute[d] and culminate[d] in a corrective disclosure").

As to the credit agency actions, the loss causation analysis is no different than with the CARE downgrade discussed above at Section IV.C.1. Whereas the CARE downgrade was limited to Eros's largest Indian subsidiary, the Moody's downgrade was for the entire Company, based on Moody's analysis of Eros's "strained liquidity profile" (¶198), and, along with the credit withdrawals, each further revealed the truth about Eros's financial condition, including Eros's inability to access the capital markets to fuel its high working capital needs. *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *3, *6 (N.D. Ill. July 28, 2009) (loss causation pled through series of partial disclosures that included credit ratings downgrades and withdrawal of credit rating).

On July 15, 2019, Eros impaired its intangible content balances by $405.5 million—wiping out approximately 40% of Eros's largest asset on its balance sheet. ¶¶202-03. In response, Eros's shares fell another 11.5% on heavy volume. ¶204. And lastly, on September 26, 2019, Eros announced a direct offering at highly unfavorable terms to use the $25 million in net proceeds for general corporate purposes; in response, Eros's shares fell nearly 30% on extremely heavy trading volume. ¶206. While not *mea culpas*, both events further revealed the true state of Eros's financial condition – that Eros did not in fact, "retain[] the full faith and confidence of its lenders" (¶94), and confirmed Eros's difficulty accessing traditional capital markets for its working capital needs – and are sufficient for pleading loss causation.

**D.      The Complaint Adequately Alleges Control Person Liability**

"Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a corporation that has committed a violation of Section 10(b)." *DFC Glob. Corp.*, 2015 WL 3755218, at *19 (citing 15 U.S.C. §78t(a)). Thus, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b)." *Urban Outfitters*, 103 F. Supp. 3d at 657 n.6. Defendants contest control person liability under §20(a) only because there is no primary violation. Mot. at 43-44. Because, as shown in the preceding sections the Complaint adequately pleads a claim under §10(b), a §20(a) claim is also adequately pleaded. *Urban Outfitters*, 103 F. Supp. 3d at 657.

**E.      The Court Has Personal Jurisdiction Over Defendant Lulla**

Defendants lastly contend that Plaintiffs' claims against Lulla should be dismissed under Fed. R. Civ. P. 12(b)(2) for failure to establish personal jurisdiction. Mot. at 44, n.18.[30] This facial attack should be denied.

"In securities cases like this one involving securities listed on domestic exchanges, Section 27 of the [Exchange Act] establishes the exclusive basis for personal jurisdiction." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 799 (S.D.N.Y. 2018). Under this section, "United States courts may exercise personal jurisdiction over non-residents to the full extent permitted by the due process clause." *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1013 (D.N.J. 1996). To satisfy due process, the nonresident defendant must (1) have sufficient minimum contacts with the forum and (2) "not offend traditional notions of fair play and

---

[30] Because this argument is raised in a single footnote, it is not properly before the Court. *See Pers. v. Teamsters Local Union 863*, 2013 WL 5676739, at *4 (D.N.J. Oct. 16, 2013) (An issue is waived unless a party raises it in its opening brief, and for those purposes "a passing reference to an issue ... will not suffice to bring that issue before this court.") (collecting cases).

substantial justice." *Id*. at 1014.  In the securities context, the appropriate forum is the United States.  *China Zenix Auto*, 2020 WL 3169506, at \*14 (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002)).

Lulla has minimum contacts with the United States.  Eros's common stock was traded on the NYSE, a U.S. stock exchange.  ¶32.  During the Class Period, Lulla was Eros's CEO and Chairman (¶33), signed SOX certifications and documents filed with the SEC (¶¶34, 150-51), made numerous statements within press releases filed with the SEC (¶¶39, 145, 157, 166, 177), and participated in multiple earnings conference calls with investors and analysts (¶¶114, 160-61, 185).  These facts constitute sufficient contacts.  *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 551 (D.N.J. 2005) (signing SEC filings and presenting at U.S. conferences constituted sufficient contacts); *Rio Tinto*, 332 F. Supp. 3d at 802 (rejecting argument that non-resident defendant's "role as CEO, signatures on SOX certifications, and statements on earnings calls are insufficient to demonstrate minimum contacts"); *China Zenix Auto*, 2020 WL 3169506, at \*15 (signing SEC filings sufficient to establish specific personal jurisdiction) (collecting cases).

The assertion of jurisdiction also adheres to principles of fairness.  "Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Derensis*, 930 F. Supp. at 1014.  Lulla proffers no reason, let alone a "compelling case" as to why jurisdiction would be unreasonable.  Although defending this action in this forum may be less convenient for Lulla, "modern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum[]"—particularly now, when the world has quickly adapted to video conferencing communication, including for litigation purposes. *City Pension Fund for Firefighters & Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*,

41 F. Supp. 3d 1369, 1407 (S.D. Fla. 2011).  U.S. Courts also have an "obvious interest in enforcing its federal securities laws and protecting its markets." *Id.* (collecting cases).  "Finally, there is a strong policy interest in permitting U.S. investors to seek relief and protection from fraud by foreign corporations." *Id.*

## V.   CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court deny Defendants' entire motion.  If the Court is inclined to grant, in whole or in part, Defendants' Motion to Dismiss, Plaintiffs respectfully request that dismissal be without prejudice and with leave to amend to cure any defects via an amended pleading.  *See* Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given); *Junker v. Med. Components, Inc.*, 2015 WL 12806501, at *1 n.1 (E.D. Pa. May 20, 2015) ("The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that a particular claim will be decided on the merits rather than on technicalities").

Dated: October 14, 2020

Respectfully submitted,

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

By:  *s/ Donald A. Ecklund*
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994 -1700

*Liaison Counsel for Plaintiffs and the Proposed Class*

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke (*pro hac vice*)
Leanne H. Solish (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Lead Counsel for Plaintiffs and the Proposed Class*

630748.6                              46

**PROOF OF SERVICE**

On October 14, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the District of New Jersey, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 14, 2020                    *s/ Donald A. Ecklund*
                                                                Donald A. Ecklund

630748.6